**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**RACHAEL NATALIE LEAHY,**

**Petitioner,**

**v.** **Case No. 8:23-cv-2041-MSS-GDP**

**SECRETARY, DEPARTMENT OF CORRECTIONS,**

**Respondent.**
_____________________________________/

**O R D E R**

Leahy filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging her state court conviction for solicitation to commit first-degree murder. After reviewing the petition (Doc. 1), the response (Doc. 10), the reply (Doc. 17), and the relevant state court record, the Court **DENIES** the petition.

**PROCEDURAL HISTORY**

Without an agreement with the prosecutor, Leahy pleaded no contest to solicitation to commit first-degree murder (Doc. 11-2 at 50–52), and the trial judge sentenced Leahy to twenty years in prison followed by three years of probation. (Doc. 11-2 at 173–75) Leahy appealed, and the state appellate court affirmed. (Doc. 11-2 at 351) Leahy filed a motion for post-conviction relief (Doc. 11-2 at 365–407), the post-conviction court denied relief (Doc. 11-2 at 665–688), and the state appellate court affirmed. (Doc. 11-2 at 860) Leahy's federal petition followed. (Doc. 1)

In her federal petition, Leahy asserts that trial counsel deficiently performed during sentencing by not objecting to an error in the scoresheet, trial counsel deficiently performed by misadvising Leahy that no minimum sentence applied and that the trial judge would grant a motion for a downward departure, trial counsel deficiently performed by failing to inform Leahy that she could still receive the lowest permissible sentence if she proceeded to trial, trial counsel deficiently performed during sentencing by not objecting to impermissible factors considered by the trial judge, trial counsel deficiently performed by not requesting a competency evaluation of Leahy, trial counsel deficiently performed by not investigating a mental health defense, trial counsel deficiently performed during sentencing by abandoning a motion for a downward departure, and trial counsel deficiently performed by not timely moving to withdraw her plea. (Doc. 1-1)

**FACTS**

When pleading no contest, Leahy stipulated that a factual basis supported the plea. (Doc. 11-2 at 50) An arrest affidavit summarizes the evidence that supported the plea (Doc. 11-2 at 10–12):

> On September 8, 2016, the defendant, Rachael Leahy, did violate Florida Statutes Section 777.04 (4)(b), Solicitation of Premeditated Murder, in Manatee County when she met with an undercover detective and solicited him to have the victim, David Leahy Jr., murdered. On August 22, 2016, a person known to Your Affiant came to the Manatee County Sheriff's Office and provided information that Rachael was looking to have her ex-husband, David, murdered.

On August 23, 2016, an undercover [detective's] phone number was given to the source, and it was passed off to Rachael. Rachael called the undercover [detective's] phone number and spoke to the undercover detective and said she had been eagerly awaiting this. Rachael was instructed to be available on August 25, 2016, for a phone call. On August 25, 2016, a phone call and text message [were] sent to Rachael so that a meet[ing] could be arranged. Rachael did not immediately respond but called back the undercover detective later in the day. Arrangements were made with Rachael over the telephone to be available on August 29, 2016, for a meet[ing].

On August 29, 2016, Rachael drove to a location in the 1200 block of 60th Avenue West in a black BMW. She met with the undercover detective and described how David has kept her children from her, and she wanted custody of the children. Rachael told the undercover detective that there is no other resolution to this, and David needs to be gone completely. The undercover detective asked Rachael if she knew what he does for a living, and she said yes. Rachael went on to describe that she has thought about David being kidnapped and taken to another country and made into a sex slave. She then stated that she knew that wasn't a realistic expectation and that she would leave it up to the undercover detective. Later in the conversation, she mentioned that he could die via an "accident" like a drowning or if he was caught in a fire. She stated that if it was a vehicle accident, there would be no guarantee that he died from that. Rachael described that she needs certainty, and he must die. Rachael described that the payment for this murder would be via the life insurance policy that David is required to carry for himself. She claimed that she is the beneficiary of the life insurance policy as it is written in their divorce agreement. The undercover detective asked if there was no insurance policy, could she pay in another fashion. The undercover detective asked if she would be ok with paying $5,000.00 for this to happen, and she said yes. Rachael wrote down detailed information about David including his address, work information, habits, his spouse's information, and the school their children attend. The undercover detective explained to Rachael that she could let him know if she changed her mind or wanted to

go with someone else, but Rachael [stated] that she was there because she had made up her mind to do this.

The undercover detective instructed Rachael to be available to meet on September 1, 2016, and she would need to bring photographs of David, a copy of their divorce paperwork detailing the life insurance policy, and a $1,000.00 deposit in United States currency. Rachael agreed to meet and provide what was requested by the undercover detective. Rachael explained that nobody is forcing her to do this as it is entirely her will.

On September 1, 2016, Rachael drove to the 1200 block of 60th Avenue West in a black BMW with Florida tag 143RAY affixed to it. Rachael met with the undercover detective and gave him $1,000.00 in cash along with a copy of her divorce paperwork and personal photographs of David. Rachael described that she could not imagine the situation would have come to this. The undercover detective reminded her about changing her mind. Rachael said that she has not changed her mind. She said she wants her kids back, and she has played nice for too long. A third meeting was then arranged for September 8, 2016 [ ].

On September 7, 2016, Your Affiant obtained surveillance photographs of David Leahy while he was traveling around Sarasota. On September 8, 2016, Rachael drove to the 1200 block of 60th Avenue West in a black BMW with Florida tag 143RAY affixed to it. Rachael again met with the undercover detective and provided $1500.00 cash. During previous controlled phone conversations, Rachael was made aware that the $1,500.00 would now put her halfway to the completion of the $5,000.00 payment for David's murder. Rachael was shown photographs of the residence and of David taken on September 7, 2016. She identified the residence and the photo of David almost immediately. Rachael and the undercover detective then discussed her leaving the country on September 9, 2016, and how the murder would occur while she was gone. Rachael was then made aware that upon her return she would be required to pay the balance of $2,500.00 to the undercover detective. Prior to the conclusion of the meeting, Rachael told the undercover detective that she may have another "job" for

> him to do. An unknown individual was holding money that belonged to her, and she was upset about it. The undercover detective and Rachael then discussed meeting after the murder of David to discuss future negotiations if she was satisfied with its outcome.

## STANDARDS OF REVIEW

### AEDPA

Because Leahy filed her federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs her claim. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of clearly

established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Leahy asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains that a petitioner must demonstrate both deficient performance and prejudice:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice after entering a plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, [she] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

## ANALYSIS

### Ground One

Leahy asserts that trial counsel deficiently performed during sentencing by not objecting to an error in the scoresheet. (Doc. 1-1 at 2–3) She contends that the scoresheet erroneously stated that the offense level for the conviction was Level 10 and that the lowest permissible sentence was sixty-six months in prison. (Doc. 1-1 at 2) She contends that the correct offense level was Level 9 and that the correct lowest permissible sentence was forty-eight months in prison. (Doc. 1-1 at 2–3)

The post-conviction court denied the claim as follows (Doc. 11-2 at 665–66) (state court record citations omitted):

> The Defendant alleges that trial counsel provided ineffective assistance of counsel by failing to object to an error in the Criminal Punishment Code Scoresheet. The Defendant claims, and the State concedes, that the Defendant's primary offense should have been ranked as a Level 9 offense instead of a Level 10 offense, which would reduce the lowest permissible sentence in her case to forty-eight months in the Department of Corrections. However, the State has provided "conclusive proof that the scoresheet error did not affect or contribute to the sentencing decision." *State v. Anderson*, 905 So. 2d 111, 118–19

> (Fla. 2005). During the sentencing hearing following the Defendant's entry of an open plea [ ], it is clear the scoresheet error did not contribute to the court's sentence. The court imposed a sentence well above the lowest permissible sentence and never indicated any inclination to impose a sentence influenced by the lowest permissible sentence. Upon pronouncement of the sentence, the court stated, "Ms. Leahy, there are consequences to one's actions. You're aware of that. Your attorney has done an excellent job in representing you, but, as I said, there are consequences."
>
> Therefore, because the Defendant has failed to demonstrate that the scoresheet error caused prejudice, the court will deny the [claim].

Whether a state court miscalculated the lowest permissible sentence under Florida's Criminal Punishment Code is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance — even when based on the failure of counsel to raise a state law claim — is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [ ] counsel failed to raise turns on state law.") (citation omitted).

Leahy pleaded no contest to solicitation to commit first-degree murder in violation of Sections 777.04(2) and 782.04(1)(a)(1), Florida Statutes. (Doc. 11-2 at 51) The scoresheet classified the crime as a Level Ten offense under the Criminal Punishment Code, imposed 116 sentence points, and calculated a lowest permissible sentence of sixty-six months in prison. (Doc. 11-2 at 124–26) However, solicitation to commit first-degree murder is a Level Nine offense. § 921.0022(3)(i), Fla. Stat. (2016).

A Level Nine offense requires the imposition of 92 sentence points and permits a lowest permissible sentence of forty-eight months in prison. (Doc. 11-2 at 125) § 921.0024(1)(a) and (2), Fla. Stat. (2016).

Even if trial counsel deficiently performed by not objecting to the scoresheet's miscalculation of the lowest permissible sentence, Leahy did not demonstrate prejudice under *Strickland*. At sentencing, the prosecutor asked the trial judge to impose a sentence of twenty-two years in prison followed by three years of probation. (Doc. 11-2 at 213, 278–79) Trial counsel asked the trial judge to impose a sentence of eighty-eight months in prison. (Doc. 11-2 at 213–14, 279–82) The trial judge imposed a sentence of twenty years in prison as follows (Doc. 11-2 at 285–86):

> [Trial judge:] Well, everyone loses. There are no winners in this matter, whether they be the children or whether it be the former husband or the former wife. And the effects will last for a lifetime for everyone, regardless.
>
> Ms. Leahy, there are consequences to one's actions. You're aware of that. Your attorney has done an excellent job in representing you, but, as I said, there are consequences.
>
> The defendant having entered a plea to the charge of [ ] criminal solicitation to commit murder in the first degree, a first-degree felony, she's hereby adjudicated guilty, sentenced to twenty years in the Florida Department of Corrections, which shall be followed by three years of probation. . . .

Leahy fails to demonstrate a reasonable probability that the trial judge would not have imposed the twenty-year sentence, if the trial judge had acknowledged that the lowest permissible sentence was forty-eight months in prison, instead of sixty-six months. The Criminal Punishment Code authorized the trial judge to impose the statutory maximum sentence of thirty years in prison. § 921.002(1)(g), Fla. Stat. ("The trial court judge may impose a sentence up to and including the statutory maximum for any offense . . . ."). The trial judge did not rely on the lowest permissible sentence to calculate the twenty-year-prison sentence imposed. The twenty-year sentence ultimately imposed did not derive from the lowest permissible sentence. The trial judge instead imposed the twenty-year-prison sentence because of the aggravated circumstances of the offense and the need to punish Leahy. § 921.002(1)(c), Fla. Stat. ("The penalty imposed is commensurate with the severity of the primary offense and the circumstances surrounding the primary offense.").

Because Leahy fails to demonstrate a reasonable probability that the outcome of the proceedings would have changed if trial counsel had successfully objected to the scoresheet, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694. *See, e.g.*, *Buckner v. United States*, 160 F.4th 1209, 1211–12 (11th Cir. 2025) ("[T]he application of an erroneous guideline range may not be dispositive when the district court gives 'a detailed explanation of the reasons the selected sentence is appropriate . . . mak[ing] it clear that the judge based the sentence . . . on factors independent of the Guidelines.'") (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016)).

Ground One is **DENIED**.

**Ground Two**

Leahy asserts that trial counsel deficiently performed by failing to advise her that a lowest permissible sentence applied at sentencing ("Sub-claim A"), by misadvising her that the trial judge would grant a motion for downward departure and would impose a sentence of two-and-a-half years in prison ("Sub-claim B"), and by abandoning the motion for a downward departure during sentencing. ("Sub-claim C") (Doc. 1-1 at 4–7)

**Sub-claim A**

Leahy asserts that trial counsel deficiently performed by failing to advise her that a lowest permissible sentence applied at sentencing. (Doc. 1-1 at 4) The post-conviction court denied the claim as follows (Doc. 11-2 at 668) (state court record citations omitted):

> [A]lthough the court did not discuss the Criminal Punishment Code Scoresheet or lowest permissible sentence with the Defendant during the colloquy, she clearly understood that the court could sentence her to anything up to thirty years' [prison]. Additionally, the Defendant's argument on this point is disingenuous and inconsistent with her [other sub-claims]. In [one sub-claim], the Defendant claims she was promised a downward departure sentence, and in [the other sub-claim], the Defendant claims she was unaware that a downward departure would be necessary to avoid a [prison] sentence. Lastly, the record makes it clear that the Defendant understood her exposure and trial counsel's intention to seek mitigation on her behalf. Trial counsel stated, in the Defendant's presence before the plea colloquy began, "The guideline sheet the State has provided is eighty-eight months with a bottom of sixty-six [months], so we are

> electing to plead open to the court. I have explained to the Defendant that the court can sentence her to anything up to the max . . . She's been under the treatment of a psychiatrist and a psychologist, and I will be filing a motion for mitigation." Therefore, the court finds that the Defendant has failed to establish ineffectiveness or prejudice as to [this sub-claim].

At the change of plea hearing, Leahy signed a plea form that advised that the maximum penalty for the crime was thirty years in prison and that no minimum penalty applied. (Doc. 11-2 at 50) A mandatory minimum sentence did not apply to solicitation to commit first-degree murder. §§ 777.04(2) and (4)(b) and 782.04(1)(a)(1), Fla. Stat. Under the Criminal Punishment Code, a lowest permissible sentence applied, and the trial judge could not sentence Leahy below the lowest permissible sentence unless she filed a motion for a downward departure and demonstrated that mitigating circumstances justified a sentence below the lowest permissible sentence. §§ 921.002(3) and 921.0026(1), Fla. Stat.

Before Leahy entered the no contest plea, trial counsel advised the trial judge in open court and in Leahy's presence that a lowest permissible sentence applied and that he intended to file a motion for a mitigated sentence (Doc. 11-2 at 196):

> [Trial counsel:] Your Honor, before — [ ] the court is Rachael Leahy. She wishes to change a previously entered plea of not guilty to a plea of no contest to the charges. The — she is pleading open to the court. The State's offer was for many, many times the guidelines. The guideline sheet that the State has provided is eighty-eight months with a bottom of sixty-six, so we are electing to plead open to the court. I have explained to the

> Defendant that the court can sentence her [to] anything up to the max.
>
> We will be requesting a sentencing [in] about thirty days out. She's been under the treatment of a psychiatrist and a psychologist, and I will be filing a motion for mitigation.

During the plea colloquy, the trial judge ensured that Leahy understood that she could receive the maximum sentence of thirty years in prison (Doc. 11-2 at 199–200):

> [Trial judge:] All right. Thank you. Now, ma'am, do you understand what your attorney said, that you're entering a plea of no contest to the felony of criminal solicitation to commit murder in the first degree? Do you understand that?
>
> [Leahy:] Yes, Your Honor.
>
> [Trial judge:] Now, under the law, that carries up to thirty years in state prison as a maximum sentence. Do you understand that?
>
> [Leahy:] Yes, Your Honor.
>
> [Trial judge:] And do you understand now that we're going to have a sentencing hearing at a later time?
>
> [Leahy:] Yes, Your Honor.
>
> [Trial judge:] And it'll be up to me to determine what the appropriate sentence should be, but I can sentence you up to thirty years, if I decide to do so. Do you understand that?

| | |
|---|---|
| [Leahy:] | Yes, Your Honor. |
| [Trial judge:] | Of course, I'll hear from any witnesses [and] evidence you have. I'll hear from the State, any witnesses and evidence they have. After that, at that time, I'll determine the appropriate sentence. Are you in agreement with that? |
| [Leahy:] | Yes, Your Honor. |
| [Trial judge:] | Now, has anyone told you at this time or suggested to you in any way any type of sentence that I may give you? |
| [Leahy:] | Yes, Your Honor. |
| [Trial judge:] | Well, has anybody suggested or told you what sentence I may give you — |
| [Leahy:] | I'm sorry, I understand the range to be — |
| [Trial judge:] | All right. So, no one has told you anything about the — |
| [Leahy:] | No, sir. |
| [Trial judge:] | — potential sentence. |
| [Leahy:] | No, Your Honor. |
| [Trial judge:] | Because, frankly, I don't know either until I've heard all the evidence — |
| [Leahy:] | Right. |
| [Trial judge:] | — and the witnesses presented at the sentencing hearing. But you have to keep in mind that it is up to me to decide the appropriate sentence and — |
| [Leahy:] | Okay. |

[Trial judge:] — I can legally sentence you up to thirty years. So, you're aware of that?

[Leahy:] That's what I understand.

In her motion for post-conviction relief, Leahy swore under penalty of perjury (Doc. 11-2 at 406) that trial counsel estimated that she would receive a sentence of twenty-four months by departing downward from the lowest permissible sentence (Doc. 11-2 at 371):

> During discussions about plea options, trial counsel failed to inform Rachael Leahy that a minimum sentence was required under the Florida Criminal Punishment Code, counseling her that she would receive a sentence of around two-and-a-half years, based upon his assessment that the [trial judge] would sentence her to half of the guideline scoresheet bottom of the guidelines.[1] Counsel told Rachael Leahy that she could expect such a sentence based upon qualification for a departure sentence under Florida Statute 921.0026. Rachael Leahy agreed to do an open plea based upon this misadvice. She entered an open plea on May 4, 2017.
>
> [1] Half of the improperly calculated sentence as described in [the earlier claim].

Because Leahy understood before she entered her plea that a lowest permissible sentence applied and that trial counsel intended to file a motion for a downward departure to request a sentence below the lowest permissible sentence, the record refutes Leahy's contention that trial counsel deficiently performed. Trial counsel correctly advised Leahy that the trial judge could sentence her below the "bottom of the guidelines" by granting a motion for a downward departure. *See* §§ 921.002(1)(f) and 921.0026, Fla. Stat.

Also, at the change of plea hearing, the prosecutor summarized the evidence described in the arrest affidavit, and the trial judge advised Leahy that she faced thirty years in prison for the first-degree felony charged in the information. (Doc. 11-2 at 203–05) The arrest affidavit demonstrates that Leahy hired an undercover detective to kill her ex-husband. The undercover detective video recorded his meetings with Leahy. Leahy denied that anyone forced her to solicit the murder. Leavy provided the undercover detective $2,500.00 in cash, paperwork from her divorce proceedings, and photographs of her ex-husband. (Doc. 11-2 at 10, 12) She identified her ex-husband and his residence in other photographs, she made plans to leave the country before the murder, and she agreed to pay another $2,500.00 after the murder. (Doc. 11-2 at 12) Also, she planned to hire the undercover detective to murder another person who stole money from her. (Doc. 11-2 at 12) She told the undercover detective that she needed her ex-husband "gone completely" and reiterated that "he must die." (Doc. 11-2 at 10)

Even if Leahy did not know about the lowest permissible sentence at the time she entered her plea, she knew that she faced a sentence of thirty years in prison, that compelling evidence proved her guilt, and that trial counsel intended to request a mitigated sentence. Consequently, Leahy failed to demonstrate a reasonable probability that, if she had learned about the lowest permissible sentence of forty-eight months in prison, she would not have entered a plea and would have insisted on proceeding to trial. Consequently, the post-conviction court did not unreasonably deny the claim. *Hill*, 474 U.S. at 59.

Sub-claim A is **DENIED**.

**Sub-claim B**

Leahy asserts that trial counsel deficiently performed by misadvising her that the trial judge would grant a motion for downward departure. (Doc. 1-1 at 4, 7) The post-conviction court denied the claim as follows (Doc. 11-2 at 666–67) (state court record citations omitted):

> [T]he court conducted a thorough and sworn plea colloquy of the Defendant. The Defendant acknowledged that the court could impose a sentence of up to thirty years' [prison]. The Defendant had ample opportunity to understand her decision, ask questions of the court, and advise the court that she believed her trial counsel had made a sentencing promise to her during their dialog on this subject. Although the court is not privy to the contents of their private communications, the extensiveness of the court's colloquy refutes the Defendant's allegation. "[A] defendant is bound by the statements he makes under oath during a plea colloquy." *Rodriguez v. State*, 223 So. 3d 1095, 1097 (Fla. 3d DCA 2017). *See also Scheele v. State*, 953 So. 2d 782, 785 (Fla. 4th DCA 2007) ("[A] plea conference is not a meaningless charade to be manipulated willy-nilly after the fact; it is a formal ceremony, under oath, memorializing a crossroads in a case."); *see also Iacono v. State*, 930 So. 2d 829, 831 (Fla. 4th DCA 2006) ("Defendants have a duty to uphold the solemn oath they take to tell the truth. They are bound by their sworn answers during a colloquy.").
>
> Additionally, the Defendant has failed to establish deficiency or prejudice based on trial counsel's prediction that she would receive a downward departure sentence. *Wallace v. United States*, No. 1:11-cv-1540-RBD, 2013 WL 500453 [at *7] (D. Md. Feb. 8, 2013), states:
>
> > The Fourth Circuit has specifically held that ineffective assistance of counsel claims do not apply to situations where trial counsel inaccurately predicts the likely sentence. *See United States v. Foster*, 68 F.3d 86, 87–88 (4th Cir. 1995) (rejecting ineffective assistance

> claim by defendant sentenced as "career offender" who entered guilty plea only upon assurances from counsel to the contrary); *and United States v. Lambey*, 974 F.2d 1389, 1394 (4th Cir. 1992) (rejecting ineffective assistance claim by defendant sentenced to 360-month term who entered a guilty plea on counsel's assurance that his sentencing guideline range was only 78 to 108 months).

> Therefore, the court finds that the Defendant has failed to establish ineffectiveness or prejudice as to [the sub-claim].

During the change of plea hearing, Leahy denied that any person had promised that the trial judge would impose a particular sentence, and the trial judge carefully ensured that Leahy understood that even the trial judge did not know what sentence that he would impose (Doc. 11-2 at 200–01):

> [Trial judge:] Now, has anyone told you at this time or suggested to you in any way any type of sentence that I may give you?
>
> [Leahy:] Yes, Your Honor.
>
> [Trial judge:] Well, has anybody suggested or told you what sentence I may give you —
>
> [Leahy:] I'm sorry, I understand the range to be —
>
> [Trial judge:] All right. So, no one has told you anything about the —
>
> [Leahy:] No, sir.
>
> [Trial judge:] — potential sentence.
>
> [Leahy:] No, Your Honor.

| | |
|---|---|
| [Trial judge:] | Because, frankly, I don't know either until I've heard all the evidence — |
| [Leahy:] | Right. |
| [Trial judge:] | — and the witnesses presented at the sentencing hearing. But you have to keep in mind it is up to me to decide the appropriate sentence and — |
| [Leahy:] | Okay. |
| [Trial judge:] | — I can legally sentence you up to thirty years. So, you're aware of that? |
| [Leahy:] | That's what I understand. |

"Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). "For the representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge*, 431 U.S. at 73–74. Because at the change of plea hearing Leahy denied under oath that any person had promised that the trial judge would impose a particular sentence, the record refutes Leahy's claim. Consequently, the post-conviction court did not unreasonably deny the claim.

Sub-claim B is **DENIED**.

**Sub-claim C**

Leahy asserts that trial counsel deficiently performed during sentencing by abandoning a motion for a downward departure. (Doc. 1-1 at 7) The post-conviction

court denied the claim as follows (Doc. 11-2 at 668–69) (state court record citations omitted):

> [I]t is inaccurate to say that trial counsel abandoned his argument for a downward departure sentence during the Defendant's sentencing hearing. Prior to the hearing, trial counsel filed a Motion for Downward Departure with the court. During the sentencing hearing, trial counsel presented the testimony of two mitigation witnesses, one mental health professional and one character witness. Trial counsel made a lengthy argument on [Leahy's] behalf, but he also acknowledged, "I understand the court was struggling with a decision to depart downward in this case." This does not represent an abandonment of the argument — it represents an acknowledgment of the reality of the Defendant's situation. The Defendant was charged with and pleaded nolo contendere to the crime of solicitation of murder in the first degree, based on her attempts to hire a hit man to murder her former husband and regain custody of her children. While making persuasive arguments for mitigation, trial counsel also understood that an attempt to "sugar-coat" the facts of her crime would cause him to lose credibility in the courtroom. An attorney who lacks credibility cannot effectively represent a client. Therefore, because the Defendant has failed to establish deficiency or prejudice, the court will deny the [the sub-claim].

Before sentencing, trial counsel filed a motion for a downward departure asserting that Leahy committed the offense in an unsophisticated manner, the criminal conduct was isolated, and Leahy was remorseful for her conduct. *See* § 921.0026(2)(j), Fla. Stat. Trial counsel submitted letters by Leahy's friends and family in support of mitigation (Doc. 11-2 at 127–41) and a report by a psychologist who examined Leahy. (Doc. 11-2 at 211) At the beginning of the sentencing hearing, trial counsel advised that he filed a motion for a downward departure but requested that, if the trial judge

did not grant the motion, trial counsel would ask for a sentence closer to the lowest permissible sentence. (Doc. 11-2 at 214)

At the hearing, trial counsel called a psychologist who testified that Leahy suffered from post-traumatic stress disorder, adjustment disorder with mixed anxiety and depression, and borderline personality features. (Doc. 11-2 at 255) The psychologist opined that Leahy was amenable to treatment and that a longer prison sentence would aggravate Leahy's mental illness. (Doc. 11-2 at 257) Also, trial counsel called Leahy's employer who testified about Leahy's good character and need for treatment. (Doc. 11-2 at 270–74) During an allocution, Leahy showed remorse and requested mercy. (Doc. 11-2 at 282–85)

The prosecutor called Leahy's ex-husband who testified about why he and Leahy divorced, about the custody arrangement for their children after the divorce, and about the circumstances leading up to Leahy's crime. (Doc. 11-2 at 214–19) Also, the prosecutor introduced into evidence an order by a judge in the divorce and custody proceedings to further explain the circumstances leading up to Leahy's crimes and Leahy's motive to commit the crime. (Doc. 11-2 at 222–23) Lastly, the prosecutor introduced into evidence excerpts of video recordings that contained conversations between Leahy and the undercover detective whom she hired to kill her ex-husband. (Doc. 11-2 at 228–33)

Before the pronouncement of the sentence, trial counsel asked the trial judge to either grant the motion for a downward departure or alternatively impose a sentence of eighty-eight months in prison (Doc. 11-2 at 279–82):

[Trial counsel:] In a case like this, in terms of what the court should do, I'll start first, when we started our discussions about resolving the case, guilt or innocence had never been the issue, but to look at the punishment issues. And she scores a Level Ten. A Level Ten already scores her at eighty-eight months, which is in the high end, and that's before the twenty-five percent reduction to get it down to the lowest permissible. I filed a motion for a downward departure. I understand the court was struggling with the decision to depart downward in this case. But basically, what the State is asking for is a sentence that's about three times the eighty-eight points. They are asking for two-hundred-forty [ ] months, or something to that effect.

. . .

I understand the need for punishment. I understand the need to protect society, but I would suggest that a more appropriate sentence would be, even if you can't go into the bottom of the guidelines, somewhere around what the guidelines would normally be, about an eighty-eight-month sentence, because that's still seven years in prison, followed by conditions. And I would agree, one of the times we do agree with the prosecutor, that she needs help. I mean, she really

> needs serious help when she comes out. And I would just ask the court not to impose what is tantamount to a life sentence.
>
> I understand this is a serious thing. I didn't attack the private investigator because I think that nothing would rationally justify a person taking another human being's life. I mean, she didn't rationalize. And I think that's clear from everything that she's done throughout this entire thing; she isn't rational. So, I don't realistically expect this court to depart downward. I don't think the facts probably would justify that. But I would ask the court to impose a sentence that gives her some chance at the rest of her life. . . .

Under Florida law, "[t]he primary purpose of sentencing is to punish the offender[,] [and] [r]ehabilitation is a desired goal of the criminal justice system but is subordinate to the goal of punishment." § 921.002(1)(b), Fla. Stat. "A downward departure from the lowest permissible sentence [ ] is prohibited unless there are circumstances or factors that reasonably justify the downward departure." § 921.0026(1), Fla. Stat. When ruling on a motion for a downward departure, a trial judge must first "determine whether it *can* depart, *i.e.*, whether there is a valid legal ground and adequate factual support for that ground in the case pending before it." *Banks v. State*, 732 So. 2d 1065, 1067 (Fla. 1999) (italics in original). The trial judge must next "determine whether [he] *should* depart, *i.e.*, whether departure is indeed the

best sentencing option for the defendant in the pending case." *Banks*, 732 So. 2d at 1068 (italics in original). When determining whether he should depart, the trial judge "must weigh the totality of the circumstances in the case, including aggravating and mitigating factors." *Banks*, 732 So. 2d at 1068. "This second aspect of the decision to depart is a judgment call within the sound discretion of the [trial judge]." *Banks*, 732 So. 2d at 1068.

Leahy pleaded no contest to solicitation to commit first-degree murder, a first-degree felony punishable by thirty years in prison. (Doc. 11-2 at 51) §§ 775.082(1)(a), 777.04(4)(b), and 782.04(1)(a)(1), Fla. Stat. Overwhelming evidence proved that Leahy hired an undercover detective to kill her husband. During a video recording presented at sentencing, Leahy told the detective that "[t]here's no other resolution to this than for him to be gone completely." (Doc. 11-2 at 229) She described her decision as "something [she] thought about for a very, very, very long time." (Doc. 11-2 at 233) When the detective suggested that Leahy may change her mind about her decision, Leahy responded, "I don't change my mind." (Doc. 11-2 at 234) Leahy told the detective, "Remember, the fastest possible, the sooner, the better." (Doc. 11-2 at 234)

Reasonable counsel would weigh this compelling evidence of Leahy's guilt against the mitigating evidence and conclude that, even though a valid legal ground may have supported a departure, a trial judge likely would determine that a departure is not appropriate in Leahy's case. Trial counsel carefully requested both a downward departure and a reasonable sentence above the lowest permissible sentence if the trial judge determined that a departure was not warranted in Leahy's case. Because Leahy

failed to demonstrate that, under these circumstances, no reasonable counsel would have proceeded with the bifurcated request, the post-conviction court did not unreasonably deny the claim. *Hannon v. Sec'y, Dep't Corrs.*, 562 F.3d 1146, 1151 (11th Cir. 2009) ("There is a strong presumption that counsel's performance is reasonable, and to rebut that strong presumption, Hannon 'must establish that no competent counsel would have taken the action that his counsel did take.'") (citation omitted).

Ground Two is **DENIED**.

**Ground Three**

Leahy asserts that trial counsel deficiently performed by failing to inform her before she entered her plea that she could proceed to trial and still move for a downward departure and request the lowest permissible sentence. (Doc. 1-1 at 8) She contends that trial counsel misadvised her that she would receive the statutory maximum sentence if a jury found her guilty at trial. (Doc. 1-1 at 8)

The post-conviction court denied the claim as follows (Doc. 11-2 at 669–70) (state court record citations omitted):

> [T]he Defendant alleges that she open-pled because trial counsel assured her that she would receive a downward departure sentence. [T]he Defendant also argues that she was unaware she could pursue a downward departure sentence after trial and that trial counsel predicted she would receive a maximum sentence if she went to trial and was convicted as charged. The Defendant claims that she wanted a jury trial, but that trial counsel intimidated her by predicting she would receive a maximum prison sentence if convicted as charged following a trial.

The Florida Supreme Court has explained the standard for guilt-phase claims of ineffectiveness with regards to pleas as follows:

> A defendant who has pleaded guilty who claims that defense counsel was ineffective for failing to advise of an available defense establishes *Strickland*'s prejudice prong by demonstrating a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial. Counsel's effectiveness is determined according to the totality of the circumstances. Therefore, in determining whether a reasonable probability exists that the defendant would have insisted on going to trial, a court should consider the totality of the circumstances surrounding the plea, including such factors as whether a particular defense was likely to succeed at trial, the colloquy between the defendant and the trial court at the time of the plea, and the difference between the sentence imposed under the plea and the maximum possible sentence the defendant faced at a trial.

*Grosvenor v. State*, 874 So. 2d 1176, 1181–82 (Fla. 2004) (emphasis added). In addition to the above-referenced factors, a court should also consider "the strength of the government's case against the defendant" when "evaluating whether the defendant really would have gone to trial if he had received adequate advice from his counsel." *Lynch v. State*, 2 So. 3d 47, 57 (Fla. 2008) (citing *Grosvenor*, 874 So. 2d at 1181).

During the sentencing hearing, the State proffered evidence of the Defendant's crime, and it is apparent from the record that the evidence was strong, and the likelihood of any defense prevailing was extremely low. The State presented an "Order Granting Former Husband's Supplemental Petition for Modification of Final Judgment," rendered in Sarasota Circuit Court Case Number 11-DR-7253 on July 9, 2014, which gave the Defendant's former husband sole

parental responsibility for their children. The order required the Defendant to see a psychologist and psychiatrist and complete the Certified Batterer's Intervention Program before any modifications could be made to the custody order. The order only allowed the Defendant to have supervised visitation with the children.

In her pursuit of a person who would murder her former husband, the Defendant engaged in several in-person, audio and video recorded conversations with an undercover detective from the Manatee County Sheriff's Office in August and September 2016. The Defendant's statements in these recordings make it clear that her desire to have her former husband murdered was motivated by her desire to regain custody of their children. The undercover detective was posing as the hit man the Defendant desired. The Defendant provided the undercover detective with photographs of her former husband, several cash deposits, copies of their divorce paperwork detailing the life insurance policy proceeds that she would use to pay him for the murder, and detailed information about her former husband's work and residential addresses, his habits, his current spouse's information and the names of their children's schools. The undercover detective gave her several opportunities to change her mind and call off the murder, but the Defendant was persistent, stating, "There is no other resolution to this than for him to be gone completely." The Defendant also stated to him, "I don't change my mind. I want my kids. I've played nice for too long." The Defendant stated she wanted her former husband to suffer when he was murdered and to know that she was responsible for his suffering and death. The Defendant also discussed having the undercover detective murder someone else for her if she was satisfied with how he murdered her former husband.

Given the strength of the State's case, and the absence of any tenable defenses to the crime, the Court finds it highly improbable that the Defendant would have ultimately opted for a jury trial, leaving an open or negotiated plea as her only options. Therefore, the Court will deny the [claim].

As explained above, Leahy's sworn statements during the plea colloquy refute her contention that trial counsel promised that the trial judge would grant a motion for a downward departure if she pleaded guilty. Leahy denied that any person had promised that the trial judge would impose a particular sentence and acknowledged that she understood that the trial judge would determine the appropriate sentence only after hearing testimony and reviewing evidence at the sentencing hearing. (Doc. 11-2 at 200–01) Leahy's sworn statements refute the claim. *Blackledge*, 431 U.S. at 73–74.

Leahy faced thirty years in prison for the first-degree felony charged in the information. §§ 775.082(b)(1), 777.04(4)(b), and 782.04(1)(a)(1), Fla. Stat. Overwhelming evidence proved Leahy's guilt. Aggravating evidence at sentencing convincingly outweighed mitigating evidence. Leahy failed to demonstrate a reasonable probability that, if trial counsel had advised her that she could request a downward departure after a jury trial, she would not have entered a plea and would have insisted on going to trial. Consequently, the post-conviction court did not unreasonably deny the claim. *Hill*, 474 U.S. at 59.

Ground Three is **DENIED**.

**Ground Four**

Leahy asserts that trial counsel deficiently performed by not objecting to impermissible factors considered by the trial judge at sentencing. (Doc. 1-1 at 9–11) She contends that trial counsel failed to object during the sentencing hearing to testimony by Leahy's ex-husband about abuse inflicted by Leahy on their children. (Doc. 1-1 at 9–10) She further contends that trial counsel failed to object to the

admission of an order by a judge in Leahy's divorce and custody proceedings that contained contested findings about abuse and mistreatment inflicted by Leahy on her children and Leahy's mental health. (Doc. 1-1 at 10–11) Lastly, she contends that trial counsel failed to object to the prosecutor's comment that she lacked any remorse and blamed other persons for her actions. (Doc. 1-1 at 11)

The post-conviction court denied the claim as follows (Doc. 11-2 at 671–74) (state court record citations omitted):

> [T]he Defendant alleges that trial counsel provided ineffective assistance of counsel by failing to object to portions of the State's evidence and argument during the sentencing hearing. Specifically, the Defendant claims that the testimony from her former husband, the introduction of an "Order Granting Former Husband's Supplemental Petition for Modification of Final Judgment," and the prosecutor's arguments regarding her lack of remorse and blame-shifting were improper. The Defendant argues that her children should not have been mentioned during the sentencing hearing because they had nothing to do with her crime.
>
> On the contrary, the court finds that the Defendant's situation with her children was central to her motive for wanting to murder her former husband. [T]he "Order Granting Former Husband's Supplemental Petition for Modification of Final Judgment," gave the Defendant's former husband sole parental responsibility for their children and prevented the Defendant from having contact other than supervised visitation until she completed several counseling requirements. Rather than complete court-ordered counseling to regain contact with and custody of her children, the Defendant opted to solicit a hit man to murder her former husband. The Defendant repeatedly referred to the children during her conversations with the undercover detective, accusing her former husband of keeping the children from her and leaving her with no alternative but to have him murdered.

The State also called the former husband as a witness during the sentencing hearing. The Defendant argues that through the former husband and the custody order, the State introduced, and the court considered, without defense objection, improper evidence of uncharged criminal conduct. The court finds that the former husband's testimony was relevant and proper. First, as the victim of the Defendant's crime, the former husband had a right to speak during her sentencing hearing, regardless of whether it was a negotiated sentence or one determined by the court. *See* § 960.001, Fla. Stat.

Historically, "[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." *See Nichols v. United States*, 511 U.S. 738, 747 (1994). Such a practice continues to withstand the scrutiny of the Supreme Court. *See id.* Our nation's highest court has even authorized a sentencing judge to consider conduct underlying an acquitted charge, provided the acquitted conduct has been proven beyond a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 157 (1997).

Admittedly, Florida courts, interpreting the due process provisions of the Florida constitution, preclude the consideration of "acquitted" conduct at sentencing. *See Doty v. State*, 884 So. 2d 547 (Fla. 4th DCA 2004). That prohibition, however, does not apply to prior conduct for which there was no acquittal, provided the judge recognizes the conduct is not a conviction, and the accused "is given an opportunity to explain or offer evidence on the issue." *See Jansson v. State*, 399 So. 2d 1061, 1064 (Fla. 4th DCA 1981) (addressing consideration of arrests without conviction at a sentencing hearing for a defendant convicted of burglary and possession of burglary tools); *Crosby v. State*, 429 So. 2d 421 (Fla. 1st DCA 1983) (applying *Jansson* to a sentencing hearing for a seventeen-year-old prosecuted as an adult); *Reaves v. State*, 655 So. 2d 1189, 1190 (Fla. 3d DCA 1995) (addressing propriety of trial judge inferring

that "firearm found in close proximity to defendant's drug supply was defendant's firearm" when imposing a sentence for violations of Chapter 893, even though "the evidence was legally insufficient to go to the jury on the charge of armed trafficking").

At a sentencing hearing, some evidence of the prior uncharged offenses or arrests must be presented. *See Reese v. State*, 639 So. 2d 1067 (Fla. 4th DCA 1994). However, the evidence may be in the form of hearsay. *See Cameron v. State*, 943 So. 2d 938, 939 (Fla 4th DCA 2006); *Jansson*, [399 So. 2d] at 1062 (citing [ ] *Williams v. New York*, 337 U.S. 241 (1949) (holding that information provided by the probation department and other sources was approved and it was held that due process was not violated when the sentence was based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal); *Cameron*, 943 So. 2d at 939 (citing *United States v. Rodriguez*, 897 F.2d 1324 (5th Cir. 1990)) ("[A] defendant's confrontation rights at sentencing hearing are severely restricted, and the court may rely upon uncontradicted hearsay testimony and even on an out-of-court statement by an unidentified informant."); *Cameron*, 943 So. 2d at 939 (citing *Williams v. Clarke*, 823 F. Supp. 1486 (D. Neb. 1993)) ("[T]he right to confront and cross-examine witnesses does not apply to sentencing proceedings; at most, due process clause requires only that defendant have access to presentence report and opportunity to rebut, by explanation or denial, any inaccurate information in the report.").

In addition to the foregoing, the court adopts and incorporates herein by reference the State's arguments related to [this claim]. In sum, the court notes that the failure to make a meritless objection cannot amount to ineffective assistance of counsel. *See, e.g.*, *Raleigh v. State*, 932 So. 2d 1054, 1064 (Fla. 2006). The court further finds that the Defendant's counsel was not ineffective for failing to object to the complained-of portions of the State's evidence and argument during the sentencing hearing. Therefore, the Court will deny [the claim].

Whether the evidence was relevant and admissible at the sentencing hearing is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney*, 876 F.3d at 1295.

Under Florida law, a trial judge "shall entertain submissions and evidence by the parties that are relevant to the sentence." Fla. R. Crim. P. 3.720(b). "It is well settled that '[a] sentencing court has wide discretion regarding the factors it may consider when imposing a sentence.'" *Dickie v. State*, 216 So. 3d 35, 37 (Fla. 2d DCA 2017) (quoting *Bracero v. State*, 10 So. 3d 664, 665 (Fla. 2d DCA 2009)). "'The sentencing court . . . must be permitted to consider any and all information that reasonably might bear on the proper sentence for a particular defendant, given the crime committed.'" *Dickie*, 216 So. 3d at 37 (citation omitted).

"[A] sentencing court is required to entertain certain submissions and evidence, but only if they are relevant to the sentence." *Harris v. State*, 347 So. 3d 72, 76 (Fla. 1st DCA 2021). "Put differently, a court is *not* required to entertain submissions which it reasonably determines are *not* relevant." *Harris*, 347 So. 3d at 76 (italics in original). Also, hearsay evidence is admissible in a non-capital sentencing hearing, so long as the prosecutor does not rely on the hearsay evidence to request a habitual offender sentencing enhancement. *McInerney v. State*, 213 So. 3d 933, 935 (Fla. 4th DCA 2017).

**Testimony by Leahy's Ex-Husband**

Leahy asserts that trial counsel deficiently performed by not objecting during sentencing to testimony by her ex-husband. (Doc. 1-1 at 9–10) Leahy's ex-husband

testified that he initiated divorce proceedings against Leahy because, while he was at work, she used zip-ties to restrain their children, tied them to their beds, and locked them in their closets. (Doc. 11-2 at 216) When he came home from work and confronted her, she agreed to stop mistreating the children but resumed the mistreatment after a few months. (Doc. 11-2 at 216) He testified that, after the divorce, he learned that Leahy continued to restrain the children with zip-ties and started to lock them in a garage. (Doc. 11-2 at 216) Also, he testified that one child returned from a visit with Leahy with a black eye. (Doc. 11-2 at 216)

Leahy's ex-husband testified that initially both he and Leahy had joint custody of the children but a judge awarded him full custody after he filed a motion. (Doc. 11-2 at 217) He testified that the judge granted Leahy supervised visitation and suspended Leahy's right to supervised visitation several times. (Doc. 11-2 at 217–18) He testified that the children did not want to attend supervised visitation with Leahy but nonetheless would attend after he encouraged them to attend. (Doc. 11-2 at 218–19) He testified that, when the Department of Children and Families learned about the criminal charge in this case, the judge terminated Leahy's right to supervised visitation. (Doc. 11-2 at 218)

The testimony by Leahy's ex-husband was relevant to explain why Leahy hired the undercover detective to kill her ex-husband. Leahy's ex-husband divorced Leahy because of her mistreatment of their children. A judge awarded Leahy's ex-husband full custody of the children because of Leahy's further mistreatment. Leahy hired the undercover detective to kill her ex-husband because of the loss of custody over her

children. The testimony was reasonably related to the circumstances surrounding the offense. *See* § 921.002(1)(c), Fla. Stat. ("The penalty imposed is commensurate with the severity of the primary offense and the circumstances surrounding the primary offense."). Also, Leahy's ex-husband had a right to appear at sentencing and testify under oath. § 921.143(1)(a), Fla. Stat. ("At the sentencing hearing, and prior to the imposition of sentence upon any defendant who has been convicted of any felony or who has pleaded guilty or nolo contendere to any crime [ ], the sentencing court shall permit the victim of the crime for which the defendant is being sentenced [ ] to [a]ppear before the sentencing court for the purpose of making a statement under oath for the record."). *See also* Art. I, §16(b), Fla. Const.

Because an objection to the testimony by Leahy's ex-husband would not have succeeded, trial counsel did not deficiently perform. *Pinkney*, 876 F.3d at 1295. *Dickie*, 216 So. 3d at 38 ("The trial court must be permitted to consider, and afford the appropriate weight to, any constitutionally and statutorily permissible information that reasonably might bear on the proper sentence for a particular defendant.").

**Order from Leahy's Divorce and Custody Proceedings**

Leahy asserts that trial counsel deficiently performed by not objecting to the admission of the order from Leahy's divorce and custody proceedings. (Doc. 1-1 at 10–11) At the sentencing hearing, the prosecutor asked the trial judge to take judicial notice of the order from the divorce and custody proceedings. (Doc. 11-2 at 222) The prosecutor explained why the order was relevant to Leahy's offense (Doc. 11-2 at 222–23):

[Prosecutor:] Yes, Your Honor. May I explain why I feel that was an important part of the case?

The defendant herself made this case in Sarasota, 2011-DR-7253, and it's relevant because she references this divorce case when she goes to meet with the hit man a few times[;] what was going on in the family law case provides a backdrop for the criminal case. The marital settlement agreement started with the shared parental responsibility, and then Mr. Leahy, [whom] we just heard from, sought to have it modified four months after the final judgment was entered based on observations of the treatment of the children and not properly caring for them. So, in 2012, the timesharing agreement was modified so the defendant could have the supervised visitation. And at one point there was an injunction in place, but when that ended, the court found it necessary to have these continued supervised visitations, and then there was a trial for the modification.

And the court found in this document that the defendant engaged in inappropriate conduct toward the children since the entry of the settlement agreement after the divorce. Mr. Leahy cooperated and paid for all the supervised visitation sessions and encouraged the children to have a relationship with their mother, but he remained concerned about their safety and their care, and she was found to be unable to attend to the needs of the children, and she was not maintaining a stable environment. And the court

found that the defendant was unable to demonstrate her capacity to provide a consistent routine given her struggle to control the children, inappropriate methods of discipline, her unwillingness to tend to the basic needs of the children in the home, and her inability to consistently follow the rules while at their school or at the supervision center.

And then finally, on page 21, my last comment would be that the court outlined what needed to be done to have the court consider unsupervised contact in the future at the conclusion of the court order. The court spelled it out for the defendant, but she apparently didn't like those steps and instead what happened is what is about to follow, which you'll see in the video.

During the video recording, Leahy told the detective that she wanted him to kill her ex-husband because of the divorce proceedings (Doc. 11-2 at 228–30):

[Detective:] Okay. So, you need to — let's start from the beginning. You tell me everything that — that's going on, that you want, the reason why we sit here talking today.

[Leahy:] Yeah. There's a man that I married. Three — we have three children, and a marriage for six years, six years, three children, the whole time I'm pregnant, taking care of kids, breastfeeding at home, that kind of thing. I didn't work. I did have a little job on the side, my eBay job, [and] he took all the money from that. But he was cheating on me during that marriage the whole time.

| | |
|---|---|
| [Detective:] | What man doesn't cheat? |
| [Leahy:] | I understand. But the thing is for the sake of my kids, I wanted to keep the marriage together, you know. I didn't want to divorce and go through all of that. But he decided that he wanted to go with my — the girl, the other girl that he was with. I guess, I don't really know what I need to — I wasn't prepared what I need to tell you. I mean, none of that matters. The only thing that really matters is that I don't get to see my children. |
| [Detective:] | Okay. |
| [Leahy:] | And I don't know what else to do. I've been fighting in court for a long time. He's a person who — you know, a lot of time people separate and for whatever the reasons, it doesn't matter, when there's kids involved, each person has to be fair to the other person and, you know, I'm the mother of his children, and you know, I'm a good mother and there's no reason for me — for him to hold back my kids from me. But he's been punishing me for over six years now, and I want to be with my children, I want to raise my kids, I want to be a mom. |
| [Detective:] | So, your problems, how does this bring me into — what do you need from me? |
| [Leahy:] | There's no other resolution to this than for him to be gone completely.<br><br>. . .<br><br>I do know what you do. I know it's an absolute[ ] extreme. I'm not this sort of |

> person but, listen, I've been through hell. I've been to the point where nothing in life matters to me except for my kids, nothing, and I don't want to do life without my kids.

The trial judge took judicial notice of an order granting a petition to modify a marital settlement agreement. (Doc. 11-2 at 142–63) The order contained a summary of evidence presented at a trial before the judge who granted the petition and the judge's factual findings. (Doc. 11-2 at 144–50) In the order, the judge granted Leahy's ex-husband "sole parental responsibility" and the "sole authority to make major decisions for the children" and granted Leahy "supervised contact" in a supervised visitation program. (Doc. 11-2 at 162) The judge further ordered that in the future Leahy could request unsupervised contact only if she underwent an evaluation by a psychiatrist, agreed to any treatment recommended by the psychiatrist, and attended a twenty-nine-week batterers' intervention program. (Doc. 11-2 at 162–63) Like the testimony by Leahy's ex-husband, the order explained why Leahy committed the offense.

In her motion for post-conviction relief, Leahy argued that the conduct described in the order was inadmissible collateral crime evidence. (Doc. 11-2 at 381–82) In the response to Leahy's motion for post-conviction, the prosecutor correctly described the conduct as inextricably intertwined evidence relevant "to establish the entire context out of which the charged crime arose, [ ] to provide an intelligent account, and [ ] to adequately describe events leading up to the crime." (Doc. 11-2 at 460–61) The post-conviction court "adopt[ed] and incorporat[ed] by

reference" the prosecutor's response. (Doc. 11-2 at 674) Because the inextricably intertwined evidence was both "relevant and admissible," an objection to the admission of the order would not have succeeded. *Ballard v. State*, 66 So. 3d 912, 917–18 (Fla. 2011). Consequently, trial counsel did not deficiently perform. *Pinkney*, 876 F.3d at 1295.

**Prosecutor's Comments About Leahy's Lack of Remorse**

Leahy asserts that trial counsel deficiently performed by not objecting to the prosecutor's comment about her lack of remorse. (Doc. 1-1 at 11) At sentencing, before Leahy's allocution, the prosecutor presented the following argument (Doc. 11-2 at 278–79):

> [Prosecutor:] Your Honor, the State stands by its recommendation of the twenty-two years followed by three years' probation following incarceration.
>
> This crime was about power and control. The judge in Sarasota outlined a clear path to reuniting with the children, but instead the defendant chose to have their father killed because things weren't going her way. This was a very sophisticated crime. Numerous calls back and forth with the undercover detective from the sheriff's office. There [were] three in-person meetings providing address information, photographs, plans for not being in the country when it happened. She was arrested with her passport in hand.
>
> The State would object to any kind of downward departure in this case. There's just no legal basis. She appears

> to keep wanting to blame everybody else for her situation, but it was actually her own actions that led to her separation of the children, and the court spelled it out for her, and she didn't like that, and she didn't want to take those steps[;] instead, she wanted to hire someone to kill Mr. Leahy as you saw in the video, Your Honor. And based on everything we heard today, especially even the last comments of the doctor, Dr. Morgan, you know her — her dangerousness, the State feels that the twenty-two-year recommendation is the appropriate sentence. Thank you.

In the motion for a downward departure, Leahy argued that the downward departure was justified in part because Leahy had shown remorse. (Doc. 11-2 at 56) *See* § 921.0026(2)(j), Fla. Stat. (authorizing a downward departure if the defendant demonstrates that "[t]he offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse").

During sentencing, a psychologist, who examined Leahy and testified on behalf of the defense, opined that Leahy believed that she was the victim in this criminal case (Doc. 11-2 at 253–54):

> [Trial counsel:] Does she see herself as a victim?
>
> [Doctor:] Oh, absolutely.
>
> [Trial counsel:] Why?
>
> [Doctor:] She is victimized because —
>
> [Trial counsel:] Is it necessarily a rational belief or does it matter if that's the way she sees herself?

| | |
|---|---|
| [Doctor:] | She sees herself as a victim. The world is hostile. Nobody is a friend. Everybody can't be trusted. She'll make that statement, I don't know who to trust. She fears everyone. She trusts no one. |
| [Trial counsel:] | Does she see herself as a victim in the court system? |
| [Doctor:] | Yes. |
| [Trial counsel:] | Does she see herself as a victim of her ex-husband? |
| [Doctor:] | Yes. |
| [Trial counsel:] | Does she see herself as a victim of her mother and father? |
| [Doctor:] | Yes. |
| [Trial counsel:] | Does she see herself as a victim in this case? |
| [Doctor:] | Yes, absolutely. |
| [Trial counsel:] | Does it matter whether or not that's true? |
| [Doctor:] | It matters only for the purposes of the court. For her, it doesn't matter because she sees herself as a victim. Unfortunately, the only way in which that can be addressed is through significant psychotherapy and psychiatric help. As far as the court is concerned, I am certain we have to judge facts, but as far as she's concerned, she's living with a separate set of facts from the majority of us. |

On cross-examination, the prosecutor asked the psychologist about Leahy's refusal to accept responsibility for her own actions (Doc. 11-2 at 263–67):

| | |
|---|---|
| [Prosecutor:] | Now, I'm up to page nine in your report. Towards the top of the page where you indicate that in the Minnesota [test], she tends to blame difficulties on others and refuses to accept responsibility for her own problems. Can you explain that a little bit more? |
| [Doctor:] | Yes. What happens is, a person such as Ms. Leahy has this delusional thinking, the world is bad and hostile and that she has this narrative, it's all or nothing, which is also fitting the bipolar or — yeah, the bipolar but also fitting what we would see with a borderline. You're either a friend or you're an enemy. And thereby, she becomes irascible, she becomes angry if it doesn't fit her narrative. |
| [Prosecutor:] | So, she's not good at accepting responsibility? |
| [Doctor:] | No, she is not. |
| [Prosecutor:] | She blames others for her — |
| [Doctor:] | That's exactly correct. |
| | . . . |
| [Prosecutor:] | Okay. Then on page twelve, what I take from her statements regarding the offense is that she was actually trying to blame the investigator, when she clearly said on the video that this is all her, that it was nobody else. So that is in line with — |

| | |
|---|---|
| [Doctor:] | That's right. |
| [Prosecutor:] | With your earlier statements. And on page thirteen, she sees the — at the top — she sees the victim as being her kids, but did she ever think of the man that she tried to have killed as the victim at all? |
| [Doctor:] | No, she didn't. She was thinking of the kids, her babies as she called them, and herself. In one place she was so — the dissidence is that she didn't want to bring harm to him, she said. And yet, killing him obviously would bring severe harm. So, it's total dissidence. There's not a connect there. |
| [Prosecutor:] | So, really it's about her? |
| [Doctor:] | That's correct. |
| [Prosecutor:] | And she has remorse for herself and her dog? |
| [Doctor:] | Uh-huh. |

Because the psychologist's testimony supported the prosecutor's comments that Leahy blamed others for her actions and refused to accept responsibility and because the comments responded to Leahy's request for a mitigated sentence based on remorse, an objection to the comments would not have succeeded. Consequently, the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1295. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001).

Ground Four is **DENIED**.

**Ground Five**

Leahy asserts that trial counsel deficiently performed by not requesting a competency evaluation of Leahy before she entered the plea. (Doc. 1-1 at 12) The post-conviction court dismissed the claim as facially insufficient as follows (Doc. 11-2 at 415–16) (state court record citations omitted and italics in original):

> Defendant [ ] alleges:
>
>> Rachael Leahy was suffering from [ ] mental health disorders at the time of her plea, and as a consequence, her no contest plea was not knowingly and voluntarily made. Trial counsel was aware of her mental health disorders well before the time she changed her plea and mentioned them at the plea hearing. The need for mental health treatment was documented within the proceedings through the testimony of Dr. Harry Morgan.
>>
>> This claim is not refuted by the record. Rachael Leahy reported to the court that she was not taking any medication at the time of her entry of her no contest plea when she was prescribed psychotropic medications and should have been taking them at that time. Trial counsel made no inquiry of Rachael Leahy, nor did the court, of her history of mental illness, although trial counsel referenced her extensive history with mental health physicians. No questions were asked to determine her mental health status, nor that she was voluntarily entering the plea. Rachael Leahy did not speak during the proceedings except to say "Yes, Your Honor" or "No, Your Honor" for the most part, rendering it very difficult to ascertain whether she did, indeed, understand the proceedings.

Defendant concludes[:]

> Rachael Leahy, with the proper evaluation and treatment, would have been able to make a knowing and voluntary decision whether to do a best interest plea or proceed to trial. Trial counsel's failure to ensure his client made a free, knowing and voluntary decision whether to plead no contest or proceed to trial constitutes ineffective assistance of counsel pursuant to Florida Rule of Criminal Procedure 3.850, and the Sixth Amendment to the U.S. Constitution and [the] Florida Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). But for this error, Rachael Leahy would have proceeded trial to pursue an insanity or entrapment defense.

The Court is unable to reach the merits of [the claim], as Defendant's claim[ ] [is] facially insufficient in one or more respects. Notably, while Defendant alleges that she was "suffering from [ ] mental health disorders at the time of her plea," she fails to allege that she was actually incompetent to proceed to trial or enter a voluntary change in her plea.[39] Indeed, as the Fourth District Court of Appeal has noted:

> Conclusory allegations of incompetency are not enough to warrant an evidentiary hearing. "[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." "Neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."[40]

In light of the foregoing, the Court will strike [the claim] without prejudice to provide Defendant an opportunity to amend, *if* she can do so in good faith, under penalty of perjury.

[39] A claim that counsel was ineffective for allowing a defendant to proceed to trial while incompetent or for failing to pursue an available insanity defense is facially insufficient where the defendant has not asserted in his motion that he actually was incompetent to proceed to trial or insane at the time of his offense. *See Luckey v. State*, 979 So. 2d 353, 354 (Fla. 5th DCA 2008).

[40] *Thompson v. State*, 88 So. 3d 312, 319 (Fla. 4th DCA 2012), *rev. denied by Thompson v. State*, 107 So. 3d 407 (Fla. 2012) (table).

Because Leahy failed to amend the claim, the post-conviction court dismissed the claim with prejudice. (Doc. 11-2 at 423–24)

The post-conviction court's dismissal of the claim for failure to state a claim is an adjudication on the merits, subject to review under Section 2254(d). *Borden v. Allen*, 646 F.3d 785, 812–13 (11th Cir. 2011). In her motion for post-conviction relief, Leahy asserted that trial counsel deficiently performed by not investigating her mental health and requesting a competency evaluation. (Doc. 11-2 at 388) Leahy alleged that she was "suffering from a mental health disorder at the time of her plea," but failed to specifically allege that she was legally incompetent to proceed. (Doc. 11-2 at 387) Leahy failed to submit an affidavit, testimony, or report by an expert who opined that she was incompetent to proceed at the change of plea hearing. Leahy's behavior at the change of plea hearing did not support any reasonable belief that she was incompetent. (Doc. 11-2 at 196–202)

During the colloquy with the trial judge, Leahy responded intelligently to the trial judge's questions and denied that she took any medication. (Doc. 11-2 at 199–202) She told the trial judge her age, confirmed that she understood the statutory maximum sentence, agreed that she voluntarily entered the plea, acknowledged that she signed the change of plea form, and denied that she had any questions. (Doc. 11-2 at 199–202) Leahy asked the post-conviction court to speculate about the results of an examination by an expert for incompetency. Even though the post-conviction court granted her an opportunity to amend her claim and identify any evidence demonstrating that she was incompetent at the time of her plea, she failed to do so. Because "'[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation,'" the post-conviction court did not unreasonably dismiss the claim as facially deficient. *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

Ground Five is **DENIED**.

**Ground Six**

Leahy asserts that trial counsel deficiently performed by not investigating a mental health defense. (Doc. 1-1 at 13–17) She contends that trial counsel should have investigated and presented at trial an insanity defense. (Doc. 1-1 at 13–17) The post-conviction court dismissed the claim as facially insufficient as follows (Doc. 11-2 at 416–18) (state court record citations omitted and italics in original):

Defendant alleges, "Trial counsel failed to inform Rachael Leahy of the possibility of using an insanity defense." Defendant claims, "[Trial counsel] failed to have an evaluation done to determine whether she was insane at the time of the alleged crime," despite being "aware of her mental health disorders well before the time she changed her plea and mentioned them at the plea hearing."

Defendant argues, "The need for mental health treatment was documented within the proceedings through the testimony of Dr. Harry Morgan," and that the following "features" would have served as the basis of an insanity defense:

> Dr. Morgan testified that her particular mental health disorders caused her, on the one hand, to trust no one; but on the other hand, to "trust whoever it is that appears to be a savior to her. And, so therefore, she defers to that person and will become moldable by them." He also testified that she suffered from delusions. He further testified that her trauma caused her to perceive herself as a victim and required her to fight for her babies. Dr. Morgan testified that Rachael Leahy suffers from bipolar disorder, manic severe without psychotic features, an adjustment disorder with mixed anxiety, depressed mood, and features of borderline personality.

Defendant alleges her mental health disorders made her susceptible to control by a female private investigator, "Cody Lee Hart," [also known as] Gertrude Fugate, who Defendant claims "had become a mother figure to Rachael, and that Rachael was acting at her direction and control during the alleged offense." Defendant argues, "She became malleable to Cody's urging and was unable to appreciate the consequence of her behavior and could not appreciate that the conduct was wrong," and claims Dr. Morgan's testimony suggested that Defendant "likely suffered from insanity at the time of the offense."

Furthermore, Defendant complains that "Trial counsel had the cell phone belonging to Rachael Leahy which contained the communications between Rachael Leahy and Cody Hart, wherein Cody Hart was pushing the idea of using a hit man on Rachael Leahy but did not furnish them to a forensic mental health specialist [or] the State, nor inform Rachael Leahy that they supported an insanity defense."

Citing Florida Rule of Criminal Procedure 3.216(c), Defendant argues, "When the defense attorney suspects that the defendant might have been insane at the time of the commission of the alleged offense, he should promptly secure the services of a confidential mental health expert to provide advice and assistance to the defense." Defendant contends trial counsel was ineffective because "Trial counsel for Rachael Leahy failed to engage such an expert and failed to request the expert that he engaged to evaluate Rachael Leahy regarding an insanity defense" and claims that "had trial counsel done so, she would not have pleaded no contest. Rachael Leahy would have gone to trial and would have prevailed on an insanity defense, [and] would have avoided conviction and been found not guilty by reason of insanity. She would not have been eligible to receive a sentence of twenty years in prison, [and] she would have been considered for conditional release and would not have been sentenced to a prison sentence at all."

While Defendant claims she "would have prevailed on an insanity defense," and alleges [that] *Dr. Moran* testified and "*suggested* that she *likely* suffered from insanity at the time of the offense," Defendant does not actually assert that she was insane at the time of the offense. Where a defendant's post-conviction motion alleges ineffective assistance of counsel for allowing a defendant "to proceed to trial while incompetent, or for failing to pursue an available insanity defense" but does not actually assert that he was incompetent to go to trial or insane at the time of the offense, the motion is facially insufficient.[53] Accordingly, Defendant fails to state a legally sufficient claim [ ].[54] Based on the foregoing, [the claim] will be stricken and Defendant will be afforded the opportunity to amend this claim, *if* she can do so in good faith, under penalty of perjury.

[53] *Luckey v. State,* 979 So. 2d 353, 354 (Fla. 5th DCA 2008).

[54] *See, e.g.*, *Thompson v. State*, 88 So. 3d 312, 319 (Fla. 4th DCA 2012) ("[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." (quoting *Card v. Singletary*, 981 F.2d 481, 487–88 (11th Cir. 1992)); *Binney v. State*, 53 So. 3d 382, 384 (Fla. 5th DCA 2011) (finding claim alleging ineffective assistance of counsel for failing to advise of insanity defense facially insufficient for Binney's failure to allege actual insanity when the offense was committed).

Because Leahy failed to amend the claim, the post-conviction court dismissed the claim with prejudice. (Doc. 11-2 at 423–24)

The post-conviction court's dismissal of the claim for failure to state a claim is an adjudication on the merits, subject to review under Section 2254(d). *Borden*, 646 F.3d at 812–13. Under Florida law, "[a]ll persons are presumed to be sane." § 775.027(1), Fla. Stat. "It is an affirmative defense to a criminal prosecution that, at the time of the commission of the acts constituting the offense, the defendant was insane." § 775.027(1), Fla. Stat. A defendant must demonstrate (1) that she suffered from a "mental infirmity, disease, or defect," and (2) that because of the condition, she "[d]id not know what [ ] she was doing or its consequences," or "[a]lthough [she] knew what [ ] she was doing and its consequences, [she] did not know that what [ ] she was doing was wrong." § 775.027(1)(a) and (b), Fla. Stat. "The defendant has the

burden of proving the defense of insanity by clear and convincing evidence." § 775.027(2), Fla. Stat.

In the motion for post-conviction relief, Leahy alleged that trial counsel failed to retain an expert to determine whether she was insane at the time of the offense. (Doc. 11-2 at 390) She alleged that trial counsel retained an expert who opined at sentencing that she suffered from delusions, bipolar disorder, adjustment disorder, depression, and other mental health disorders. (Doc. 11-2 at 391) She contended that this testimony would have supported an insanity defense. (Doc. 11-2 at 391) She contended that her mental health disorders made her susceptible to influence and direction by a private investigator who became a "mother figure," who first suggested that she should hire a hit man to kill her ex-husband, and who continued to discuss the plan for over a year. (Doc. 11-2 at 391–93) She contended that her mental health disorders "suggested that she likely suffered from insanity at the time of the offense." (Doc. 11-2 at 393)

Leahy failed to submit an affidavit, testimony, or report by an expert who opined that she was insane at the time of the offense. The doctor who testified at sentencing did not evaluate Leahy for insanity. He testified that he evaluated Leahy for personality and psychological disorders. (Doc. 11-2 at 242–46) Based on his evaluation and a review of records, the doctor opined that Leahy suffered from posttraumatic stress disorder, adjustment disorder with mixed anxiety, depression, and borderline personality features. (Doc. 11-2 at 255) However, the doctor did not further opine that because of any of these conditions, Leahy did not know what she

was doing or its consequences at the time of the offense or that she did not know what she was doing was wrong. *See* § 775.027(1)(b), Fla. Stat. Like her claim based on incompetency, Leahy asked the post-conviction to speculate about the results of an examination by an expert for insanity. Even though the post-conviction court granted her an opportunity to amend her claim and identify any evidence demonstrating that she was insane at the time of the offense, she failed to do so. Because Leahy speculated that she suffered from insanity at the time of the offense, the post-conviction court did not unreasonably dismiss the ineffective assistance of counsel claim as facially deficient. *Brownlee*, 306 F.3d at 1060.

Ground Six is **DENIED**.

**Ground Seven**

Leahy asserts that trial counsel deficiently performed by not requesting a motion for a downward departure at sentencing. (Doc. 1-1 at 18–20) She contends that, even though trial counsel filed a motion for a downward departure, trial counsel failed to present evidence that supported the motion and abandoned the request for a departure at the sentencing hearing. (Doc. 1-1 at 18–20)

The post-conviction court denied the claim as follows (Doc. 11-2 at 674–76) (state court record citations omitted):

> [T]he Defendant alleges that trial counsel provided ineffective assistance of counsel by failing to pursue a downward departure sentence. [T]rial counsel did argue in favor of a downward departure sentence. Trial counsel filed a written motion in support of his arguments before the sentencing hearing. During the sentencing hearing, trial counsel presented the testimony of two mitigation

witnesses, one mental health professional, and one character witness. Trial counsel asked the Defendant to speak on her own behalf. At the conclusion of the presentation of evidence, trial counsel made a lengthy argument on her behalf, focusing mainly on the mental health mitigation he provided to the Court. Although trial counsel conceded that a downward departure was unlikely and asked for the lowest permissible sentence if the Court was inclined not to depart, this was in response to the reality of the seriousness of the situation the Defendant created, and trial counsel argued as effectively as he could under the circumstances.

Additionally, it is purely speculative to claim that the court would have departed if trial counsel had spent more time arguing in favor of every possible subsection of Section 921.0026, Fla. Stat. *See Jones v. State*, 845 So. 2d 55, 64 (Fla. 2003) (stating [that] "[p]ost-conviction relief cannot be based on speculative assertions."). The court was certainly aware of the range of options permitted under the downward departure statute and could have departed based on one or more of its grounds, had the court felt that departure was legal and appropriate under the circumstances. *See Banks v. State*, 732 So. 2d 1065, 1067 (Fla. 1999) (stating [that] "[a] trial court's decision whether to depart from the guidelines is a two-part process. First, the court must determine whether it can depart, *i.e.*, whether there is a valid legal ground and adequate factual support for that ground in the case pending before it (step one) . . . . Second, where the step one requirements are met, the trial court further must determine whether it should depart, *i.e.*, whether departure is indeed the best sentencing option for the defendant in the pending case."). Likewise, it is also purely speculative to imagine that the testimony about or from Cody Hart, the person who supposedly influenced the Defendant to hire a hit man, would have changed the outcome of the Defendant's sentencing hearing. Furthermore, the Court adopts and incorporates herein by reference the rationale outlined in the State's response to [the claim] as additional support for denying the [claim].

As explained above, trial counsel filed a written motion for a downward departure and submitted letters by Leahy's family and friends in support of mitigation. (Doc. 11-2 at 55–62, 127–41) At the sentencing hearing, a psychologist testified that Leahy suffered from mental disorders, advised that the mental disorders were treatable and that Leahy was amenable to treatment, and opined that a sentence that required mental health treatment was favorable over a sentence that required incarceration. (Doc. 11-2 at 255–58) Also, Leahy's employer testified about Leahy's emotional suffering from the loss of custody of her children and her need for treatment. (Doc. 11-2 at 271–74) Reasonable counsel would weigh the compelling evidence of Leahy's guilt against this mitigating evidence and conclude that, while a valid legal ground likely supported a departure, a trial judge very likely would determine that a departure was not appropriate in Leahy's case. *Banks*, 732 So. 2d at 1068.

At sentencing, trial counsel carefully requested both a downward departure and a reasonable sentence above the lowest permissible sentence if the trial judge determined that a departure was not warranted in Leahy's case. (Doc. 11-2 at 279–82) Because Leahy failed to demonstrate that no reasonable counsel would have proceeded with the bifurcated request, the post-conviction court did not unreasonably deny the claim. *Hannon*, 562 F.3d at 1151.

Also, Leahy speculates that, if trial counsel had only moved for a downward departure and did not also ask for a reasonable sentence above the lowest permissible sentence, the trial judge would have granted the motion for a downward departure and imposed a sentence below the lowest permissible sentence. When faced with the

bifurcated request, the trial judge denied the motion for a downward departure and imposed a sentence of twenty years in prison, or sixteen years above the lowest permissible sentence. Because Leahy failed to allege facts that demonstrated a reasonable probability that the outcome at sentencing would have changed if trial counsel had not requested a reasonable sentence above the lowest permissible sentence, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694.

Ground Seven is **DENIED**.

**Ground Eight**

Leahy asserts that trial counsel deficiently performed by not moving to withdraw her plea after sentencing. (Doc. 1-1 at 21–22) Leahy contends that she could have withdrawn her plea because the plea was involuntary. (Doc. 1-1 at 21–22) The post-conviction court denied the claim as follows (Doc. 11-2 at 676–77) (state court record citations omitted):

> [T]he Defendant alleges two separate errors. First, [ ] the Defendant alleges that trial counsel provided ineffective assistance of counsel by failing to move the court to allow the Defendant to withdraw her plea, claiming that her plea was involuntary because trial counsel assured her of a downward departure sentence and then failed to pursue it. As the Court has previously found [ ], trial counsel did not provide ineffective assistance during the plea and sentencing hearings, thus rendering her plea voluntary. Trial counsel did not have grounds to move to withdraw the Defendant's plea after the sentencing hearing. "To file a facially sufficient motion to withdraw plea after sentencing, the burden is on the defendant to prove that a manifest injustice has occurred (for example, the plea was involuntarily entered) and that withdrawal is necessary to

> correct this injustice." *Ingraham v. State*, 248 So. 3d 153, 154 (Fla. 4th DCA 2018). Because the Defendant's plea was voluntary, manifest injustice did not occur.
>
> [Second], the Defendant alleges that trial counsel provided ineffective assistance of counsel when he did not advise her to move to withdraw her plea on the basis of her incompetency. The Defendant makes this allegation based on her history of mental health diagnoses, not her behavior in the courtroom. "In order to establish prejudice in a properly raised ineffective assistance of counsel claim, the post-conviction movant must . . . set forth clear and convincing circumstances that create a real, substantial and legitimate doubt as to the movant's competency." *Thompson v. State*, 88 So. 3d 312, 319 (Fla. 4th DCA 2012). Upon reviewing transcripts of the Defendant's plea and sentencing hearings, it is apparent that the Defendant is not exhibiting any signs of incompetency. The Defendant is rational, asks good questions, and gives clear responses. There is no credible reason to believe she was incompetent and that her plea was involuntary. As previously stated, defense counsel cannot be ineffective for failing to raise a meritless motion or objection. *See, e.g.*, *Raleigh v. State*, 932 So. 2d 1054, 1064 (Fla. 2006). Therefore, the Court will deny the [claims].

Under Florida law, "[a] defendant who pleads guilty or nolo contendere without expressly reserving the right to appeal a legally dispositive issue may file a motion to withdraw the plea within thirty days after rendition of the sentence[.]" Fla. R. Crim. P. 3.170(l). A defendant may seek relief for an involuntary plea. Fla. R. App. P. 9.140(b)(2)(A).

"[P]ursuant to Rule 3.170(l)[,] a defendant must make a showing of manifest injustice or prejudice in order to withdraw a plea of guilty or nolo contendere following the rendition of a sentence." *Campbell v. State*, 125 So. 3d 733, 736 (Fla. 2013). "'This is a more stringent standard than a motion to withdraw a plea filed before

sentencing; the burden falls on the defendant to prove that withdrawal is necessary to correct the manifest injustice.'" *Hamil v. State*, 106 So. 3d 495, 497 (Fla. 4th DCA 2013) (citation and italics omitted). "When challenging the voluntariness of a plea, 'mere allegations are not enough; the defense must offer proof that the plea was not voluntarily and intelligently entered.'" *Hamil*, 106 So. 3d at 497 (citation and italics omitted).

In her motion for post-conviction relief, Leahy contended that her plea was involuntary because trial counsel misadvised her that the trial judge would grant a motion for a downward departure if she pleaded no contest, because trial counsel failed to advise her that he planned to withdraw the motion for a downward departure at sentencing, and because trial counsel misadvised her that she would receive the statutory maximum sentence if she proceeded to trial. (Doc. 11-2 at 401–02)

For the reasons explained above, trial counsel did not deficiently perform. Leahy's sworn statements at the change of plea hearing refute her contention that trial counsel misadvised her either that the trial judge would grant a motion for a downward departure if she pleaded no contest or that the trial judge would impose the statutory maximum sentence if she proceeded to trial. (Doc. 11-2 at 200–01) *Blackledge*, 431 U.S. at 73–74. Also, at the sentencing hearing, trial counsel carefully requested both a downward departure and, alternatively, a reasonable sentence above the lowest permissible sentence if the trial judge determined that a departure was not warranted. Lastly, overwhelming evidence proved Leahy's guilt, and the prosecutor asked for a sentence of twenty-two years in prison. (Doc. 11-2 at 213) Apparently persuaded to

some degree by counsel's arguments, the trial court imposed a twenty-year sentence. Leahy did not present to the post-conviction court any evidence that trial counsel advised her that the trial judge would impose the statutory maximum sentence of thirty years in prison if she proceeded to trial. Even if trial counsel rendered that advice, Leahy failed to plausibly demonstrate that she would not have entered a plea and would have instead insisted on going to trial after receiving that advice. *Hill*, 474 U.S. at 59. *Diveroli v. United States*, 803 F.3d 1258, 1263 (11th Cir. 2015) ("'[T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.'") (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

Also, in her motion for post-conviction relief, Leahy contended that her plea was involuntary because trial counsel failed to retain an expert to evaluate her for competency before she entered her plea. (Doc. 1-1 at 22) As explained above, Leahy failed to submit an affidavit, testimony, or report by an expert who opines that she was incompetent to proceed at the change of plea hearing. Leahy's behavior at the change of plea hearing did not support any reasonable belief that she was incompetent. (Doc. 11-2 at 196–202) During the colloquy with the trial judge, Leahy responded intelligently to the trial judge's questions. (Doc. 11-2 at 199–202) Because Leahy failed to present any evidence of her incompetency at the time of the change of plea hearing, the post-conviction court did not unreasonably deny the claim.

Because a motion to withdraw the plea based on an involuntary plea would not have succeeded, trial counsel did not deficiently perform by failing to file the

motion. Consequently, the post-conviction did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1295.

Ground Eight is **DENIED**.

Accordingly, Leahy's petition (Doc. 1) for a writ of habeas corpus is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Leahy to **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Leahy neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on August 12, 2026.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE